UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| THEODORE V. ABNER, JR., an individual, and JIMMY R. NEWTON, JR., an individual,<br><br>       *Plaintiffs,*<br>v.<br><br>IFIXANDREPAIR, LLC, a Florida limited liability company,<br><br>       *Defendant.* | CASE NO: |

## COMPLAINT

Plaintiffs Theodore V. Abner, Jr. and Jimmy R. Newton, Jr. file this Complaint against Defendant iFixandRepair, LLC.[1]

## INTRODUCTION

1. This case presents a textbook example of the noncompete abuse that plagues workers and entrepreneurs throughout the United States, particularly in the South: An employer is threatening two former employees with unenforceable noncompete agreements in an effort to bully them into shutting down their nascent business.

2. iFix operates electronic device repair stores. It employed Abner and Newton as a technician and a manager, respectively, for its iFix store on Whittlesey Boulevard in Columbus, Georgia, from 2018 until 2020. With their technical expertise and service ethic, Plaintiffs transformed a mediocre iFix store into a top performer consistently generating more than $20,000 in monthly revenue.

---

[1] Plaintiff Theodore V. Abner, Jr., is referred to as "Abner." Plaintiff Jimmy R. Newton, Jr., is referred to as "Newton". Collectively, Plaintiffs Abner and Newton are referred to as "Plaintiffs". Defendant iFixandRepair, LLC, is referred to as "Defendant" or "iFix".

3. iFix paid the two little above the federal minimum wage. It refused to pay Newton overtime wages. It miscalculated, withheld, and otherwise reduced commissions owed to both men. It required Plaintiffs to buy their own work tools without reimbursing them. It laid Abner off when the COVID-19 pandemic hit, and was outraged when he would not return to work weeks later despite the fact that he had the coronavirus at that time. It refused to supply Newton with proper protective gear or to engage in basic precautions to protect employees or customers as the pandemic spread.

4. Plaintiffs moved on. They launched their own electronics repair shop. iFix now claims that restrictive covenants in their employment agreements prohibit their competition. But nothing about Abner or Newton's iFix employment implicated any legitimate business interest. Plaintiffs obtained their technical knowledge from prior work experience or, when necessary, YouTube and Google. Customers came in solely for one-off engagements that do not create protectable, long-term relationships under Florida law. The restrictive covenants — and iFix's actions to enforce them — are simply illegal attempts to stifle fair, ordinary, and lawful competition.

5. This is an action for a declaratory judgment holding the at-issue restrictive covenants illegal, breach of contract, and violation of the Fair Labor Standards Act ("FLSA") for failure to pay overtime wages.

## PARTIES, JURISDICTION, AND VENUE

6. Plaintiff Abner is a Georgia citizen residing in Columbus County, Georgia.

7. Plaintiff Newton is a Georgia citizen residing in Columbus County, Georgia. At all times material, Newton was iFix's employee within the meaning of 29 U.S.C. 203(3).

8. Defendant iFix is a limited liability company organized and existing under the laws of the State of Florida that maintains its principal place of business at 429 Seabreeze Boulevard, Fort Lauderdale, Florida 33316. iFix is an employer within the meaning of 29 U.S.C. § 203(d). At all times material, iFix was an "enterprise engaged in commerce" within the meaning of 29 U.S.C. § 203. All iFix members are citizens of the State of Florida.

9. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states in which the amount in controversy exceeds $75,000.00 per Plaintiff, exclusive of interest and costs. First, both Abner and Newton each stand to make at least $75,000 from their new venture, which is now in jeopardy as a result of iFix's threats and pending a determination of the Parties' rights by this Court. Second, under Florida Statutes § 542.335, the statutory attorneys' fees related to the declaratory judgment will easily exceed $75,000 per Plaintiff. Third, Plaintiffs are entitled to payment of substantial commissions, the amount of which cannot be calculated without access to information that resides exclusively in the possession of the Defendant.

10. This Court has jurisdiction over Newton's FLSA claim pursuant to 28 U.S.C. § 1331.

11. This Court has personal jurisdiction over iFix because its principal place of business is in this District and it continuously conducts business in this District.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Defendant is subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

**A. Plaintiffs Join iFix**

13. iFix owns and operates "iFixandRepair" stores that provide repair services for phones and other electronic devices.

14. On June 6, 2018, Newton entered into an "Employment Agreement" (the "Newton Employment Agreement") and began working at the iFix store located inside a Walmart on Whittlesey Boulevard in Columbus, Georgia ("Whittlesey Store"). *See* Newton Employment Agreement attached hereto as Exhibit "A".

15. All aspects of Newton's daily responsibilities were tightly managed by iFix and the policies, procedures, and practices it enacted. For example, Newton was:

   a. Required to work on a schedule set by iFix;

   b. Required to use company-provided forms, contracts, and software;

   c. Required to follow company-prescribed procedures and instructions; and

   d. Provided a desk in the Whittlesey Store.

16. On July 24, 2018, Abner entered into an employment agreement with iFix (the "Abner Employment Agreement") and began working at the Whittlesey Store. *See* Abner Employment Agreement attached hereto as Exhibit "B". Abner was a capable employee with ten (10) years of experience in repairing Apple, Android, and other electronics.

17. When Plaintiffs joined the Whittlesey Store, its sales were mediocre and its staff — a single manager at the time — had little expertise to provide any services beyond repairing broken screens.

18. The store's work tools were so limited and worn out that Plaintiffs had to buy their own just to do their jobs.

19. iFix did not provide Plaintiffs any training or repair manuals. Newton and Abner relied on their own extensive knowledge to perform most repairs — and on YouTube or Google when a device presented a novel problem.

20. iFix had no true relationships with its customers. Customer interactions generally were limited to ad hoc repair requests, each performed as a one-off engagement that precluded exclusivity, ongoing business, or long-term attachment.

21. Newton and Abner launched the store's first advertising campaign to bring in a reliable stream of new business, sometimes using their own money to print business cards and flyers.

22. Instead of rewarding Newton and Abner for their performance, iFix nickel-and-dimed the Plaintiffs throughout their tenure with the company.

**B. iFix Refuses to Compensate Newton for Overtime**

23. Within two months of joining iFix, Newton had trained himself — on his own time and at his own cost — to perform more phone and electronic repairs than the store manager who hired him.

24. When that manager resigned six months later, Newton was promoted to replace him.

25. In this role, iFix required Newton to administer inventory, manage the store's location, interface with district-level managers, supervise two part-time technicians, and perform phone and electronic repairs.

26. Newton routinely worked between forty-five (45) and fifty-five (55) hours in a workweek on tasks that furthered iFix's business.

27. iFix failed to pay Newton overtime wages for hours worked in excess of forty (40) hours in a workweek.

### C. iFix Breaches the Compensation Provisions of its Employment Agreements with Abner and Newton

28. At the same time Newton was not paid overtime, both he and Abner were denied proper compensation under their Employment Agreements.

29. For example, iFix agreed to (a) reimburse Plaintiffs for out-of-pocket expenses incurred by them to purchase tools "needed to perform [their] job function[s]" and (b) pay any performance commissions they earned pursuant to iFix's incentive policies during their tenure. *See* Exs. A, B at §§ 4-5.

30. Among other compensation, iFix agreed with both Plaintiffs to pay them monthly commissions if they and their Whittlesey Store satisfied certain performance targets. Specifically, Plaintiffs' signed a Commission Structure document in connection with their respective Employment Agreements (the "Commission Structure"). *See* Abner Commission Structure, attached hereto as Exhibit "C."[2]

31. Pursuant to the Commission Structure, Abner was entitled to 6% of gross profit on all products sold if he and the Whittlesey Store hit certain monthly targets.

32. Pursuant to the Commission Structure, Newton was entitled to a percentage of the store's monthly gross profits if he and the Whittlesey Store hit certain monthly target.

33. For thirteen (13) consecutive months during Newton's tenure as store manager, the Whittlesey Store beat the store-wide performance targets. And both Plaintiffs beat their individual performance targets required for commission compensation.

---

[2] Newton is not in possession of his signed Commission Structure document. On information and belief, he executed such a document that is identical to the one signed by Abner.

34. iFix refused to pay Abner and Newton the commission compensation that they were owed on numerous paydays.

35. Incidents like these — of iFix miscalculating, withholding, or taking unilateral deductions from Newton and Abner's compensation — were a frequent occurrence during Newton and Abner's tenure with iFix.

36. iFix was required to pay Plaintiffs any compensation earned prior to termination. *See* Exs. A, B at §§ 4. As it had throughout their tenure, iFix failed to do so.

**D. Newton and Abner Separate from iFIX**

37. When the coronavirus pandemic erupted in March 2020, iFix laid Abner off and required Newton to keep the Whittlesey Boulevard store open — even as the rest of Columbus, Georgia, went under stay-at-home social distancing orders.

38. iFix implemented no precautions and provided no equipment to protect Newton, other iFix employees or the customers of the Whittlesey Store from COVID-19. iFix refused Newton's requests for protective equipment. Newton had to buy gloves, masks, and hand sanitizer out of his own pocket.

39. When iFix re-hired some of its laid-off technicians from multiple stores in the area, it forced them all to work at the Whittlesey Store. This dangerously overcrowded the store — a space that could fit, at most, three socially distanced workers.

40. iFix called Abner back to work. At the time, Abner had COVID-19. Despite being aware of this, iFix ordered him to work if he wanted his job back. Abner refused.

41. A month later, Newton left iFix.

### E. Plaintiffs Lawfully Compete with iFix

42. Out of a job, Abner began fixing phones and other electronics from his porch to pay his bills.

43. Abner's venture proved successful. Within a few weeks, his technical knowledge and customer service was earning him more business than he could handle by himself.

44. In June 2020, Abner asked Newton to join his nascent business. Newton agreed. The business grew. And within a couple more months, the two partners were ready to make their enterprise official: They incorporated The Cell Plug, L.L.C. ("The Cell Plug"), a Georgia limited liability company, and leased a small storefront in Columbus located on 3551 Macon Road, Suite 101, Columbus, Georgia 31907.

### F. iFix Seeks to Stifle Newton and Abner's Competition

45. Plaintiffs' respective Employment Agreements contain restrictive covenants ("Restrictive Covenants"). *See* Exs. A, B at §§ 9. The Restrictive Covenants in both Employment Agreements are identical and are governed by Florida law. *See* Exs. A, B at §§ 21.

46. On November 16, 2020, an iFix technician at the Whittlesey Store referred a customer to The Cell Plug because her phone needed repairs that the Whittlesey Store could not perform. Plaintiffs accepted the referral and performed the required repairs.

47. On November 20, 2020, iFix sent identical cease-and-desist letters to Plaintiffs. The letters threatened a lawsuit over the Restrictive Covenants and demanded Plaintiffs shutter their business. *See* November 20, 2020, iFix Letters to Plaintiffs, attached hereto as Composite Exhibit "D," at 1 and 3.

48. The same day, iFix sent a third cease-and-desist letter to Plaintiffs that, in addition to accusing them of breaching the Restrictive Covenants, claimed they had engaged a former iFix employee named Christie Cox in violation of the competition restrictions in *her* employment agreement. *Id*. at 5. Neither Newton, Abner, nor The Cell Plug, LLC, has engaged or employed Christie Cox.

49. iFix provided no evidence that it possesses any legitimate business interests to support the enforceability of the Restrictive Covenants. None exists.

50. iFix knows that the realities of its business — the one-off retail customers, its failure to provide training, the availability of technical knowhow online — preclude it from having any legitimate business interest. iFix sent the letters to Plaintiffs to bully The Cell Plug into folding.

51. Because of iFix's conduct, Plaintiff's ability to compete and make a living is in jeopardy.

**G. iFix's Restrictive Covenants Are Unenforceable and Illegal**

52. The Restrictive Covenants do not protect any of iFix's legitimate business interests. They serve only to restrain trade by cutting two talented and experienced technicians from the Columbus, Georgia, market. They are unenforceable as a matter of law.

### i. *iFix Lacks Any Protectable Confidential Information*

53. The technical knowledge Plaintiffs used while employed by iFix is neither unique nor confidential and is – in fact – all publicly available.

54. Any information Plaintiffs gained about iFix's prices is neither confidential nor valuable because it is routinely shared with customers and customers routinely share it with other repair shops to get the best price.

9

55. Any customer history or contact information is useless: Customers resort to repair stores sporadically based on the random, infrequent incidence of device malfunctions. Even then, they select repair stores on an ad hoc basis without long-term attachments or exclusivity.

### ii. *iFix Lacks Any Protectable Relationships*

56. iFix has no protectable customer relationships.

57. iFix's interactions with customers are generally sporadic engagements to perform discrete repairs.

58. These engagements do not implicate an ongoing business relationship or the reasonable expectation of future business because they end once the repairs are done. iFix's customers are never bound to use iFix exclusively. And those customers routinely shop around and solicit offers from competing vendors.

### iii. *iFix Did Not Provide Plaintiffs with Extraordinary Training*

59. iFix did not provide Plaintiffs with any formal training — and certainly no training beyond that which is standard in the phone and electronics repair industry.

### COUNT I — BREACH OF CONTRACT
(Plaintiff Abner against Defendant)

60. Plaintiff Abner repeats and realleges Paragraphs 1-6, 8, 9, 11-13, 16-18, 28-31, 33-37, 39, 40, and 42-44 as if fully set forth herein.

61. The Abner Employment Agreement is a valid contract between Abner and Defendant.

62. Defendant failed to pay Abner performance commissions in accordance with the Abner Employment Agreement.

63. Defendant failed to reimburse Abner in accordance with the Abner Employment Agreement for out-of-pocket expenses he incurred to purchase tools he needed in performing his job.

64. Each of these actions constitutes a material breach of the Abner Employment Agreement by Defendant.

65. As a direct and proximate result of Defendant's breaches of the Abner Employment Agreement, Abner has suffered harm and is entitled to compensatory damages resulting from Defendant's conduct in an amount to be determined at trial.

### COUNT II — BREACH OF CONTRACT
(Plaintiff Newton against Defendant)

66. Plaintiff Newton repeats and realleges Paragraphs 1-5, 7-9, 11-15, 17-25, 28-30, and 32-36 as if fully set forth herein.

67. The Newton Employment Agreement is a valid contract between Abner and Defendant.

68. Defendant failed to pay Newton performance commissions in accordance with the Newton Employment Agreement.

69. Defendant failed to reimburse Newton in accordance with the Newton Employment Agreement for out-of-pocket expenses he incurred to purchase tools needed in performing his job.

70. Each of these actions constitutes a material breach of the Newton Employment Agreement by Defendant.

71. As a direct and proximate result of Defendant's breaches of the Newton Employment Agreement, Newton has suffered harm and is entitled to compensatory damages resulting from Defendant's conduct in an amount to be determined at trial.

## COUNT III — DECLARATORY JUDGMENT THAT THE RESTRICTIVE COVENANTS ARE UNENFORCEABLE UNDER FLA. STAT. § 542.335
(Plaintiffs against Defendant)

72. Plaintiffs repeat and reallege Paragraphs 1-9, 11-26, and 28-59 as if fully set forth herein.

73. Defendant maintains that the Restrictive Covenants are enforceable.

74. A dispute exists between Plaintiffs and Defendant regarding the enforceability of the Restrictive Covenants.

75. There exists an actual controversy that flows from Defendant's assertion that Plaintiffs are bound by the Restrictive Covenants such that their operation of The Cell Plug and fair competition with Defendant are in jeopardy.

76. Plaintiffs and Defendant's legal rights, powers, and duties depend upon a declaration by this Court.

77. All parties with any interest in the declaration sought are before this Court and will have an opportunity to respond.

78. Neither the controversy nor the facts upon which it is based are hypothetical. The parties have a concrete controversy that is susceptible to conclusive judicial determination because a declaration regarding the enforceability of the Restrictive Covenants would immediately clarify the parties' respective rights, powers, and duties.

79. Plaintiffs have suffered injury and are threatened with further injury because of iFix's misrepresentations, and threats of litigation based on misrepresentations, that Plaintiffs are bound by the Restrictive Covenants and that the Restrictive Covenants prohibit their lawful operation of The Cell Plug and competition in the electronics repair market of Columbus, Georgia.

80. The Restrictive Covenants constitute unlawful restraints of trade under Florida Statutes § 542.335 because they are neither supported by nor necessary to protect any legitimate business interests. Specifically:

   a. Plaintiffs did not have access to and were not exposed to any confidential or proprietary business information or trade secret that was unique to iFix and that could be used to engage in unfair competition;

   b. No customer relationships potentially at issue are substantial or protectable;

   c. Plaintiffs did not receive any specialized or extraordinary training from iFix; and

   d. There are no other legitimate business interests that could justify enforcement of the Restrictive Covenants against Plaintiffs.

81. The Restrictive Covenants merely serve to prevent competition *per se*, rendering them violative of Florida Statutes § 542.335 and unenforceable as a matter of law.

82. Accordingly, Plaintiffs seek a declaration that the Restrictive Covenants are void, unlawful, and unenforceable under Florida law.

### **COUNT IV — VIOLATION OF THE FAIR LABOR STANDARDS ACT**
(Plaintiff Newton Against Defendant)

83. Plaintiff Newton repeats and realleges Paragraphs 1-5, 7, 8, 10-12-15, 17-27, and 34-37 as if fully set forth herein.

84. Newton regularly worked for Defendant in excess of forty (40) hours a week.

85. During his employment, Newton never qualified as an executive, administrative, or outside sales employee, or any other kind of employee exempt from overtime regulations under 29 C.F.R. Part 541 § 13. For example:

   a. Newton's job duties included both managing the Whittlesey Store and performing repairs on phones and other electronics like a technician.

   b. Newton's job duties required his physical presence at the Whittlesey Store for the majority of his hours worked.

    c. Newton was never compensated by iFix on a salary basis at a rate equal to or in excess of $684 per week.

    d. Newton never customarily and regularly directed the work of two or more other full-time employees or their equivalent.

86. Newton's work for Defendant affected interstate commerce for the relevant time period because the materials that he used on a constant and continual basis, and that were supplied to him by Defendant, a Florida based entity conducting business in Georgia, to be used on the job, moved through interstate commerce prior to and/or subsequent to Newton's use of the same.

87. Defendant grossed in excess of $500,000 per annum for the relevant time period.

88. At all times material, Defendant maintained control, oversight, and direction over Newton in his capacity as Defendant's employee, including, but not limited to, hiring and firing decisions, determining his rate of pay and work schedule, maintaining employment records, and otherwise controlling the terms and conditions of Newton's employment.

89. At all times material, Defendant had control over and power to change compensation practices that harmed Newton and other individuals Defendant employed.

90. Defendant failed to make, keep, and preserve accurate records with respect to Newton's hours worked each workday and total hours worked each workweek, as required by 29 U.S.C. § 211(c) and supporting federal regulations.

91. The FLSA, pursuant to 29 U.S.C. § 207, requires covered employers, such as Defendant, to compensate all non-exempt employees, such as Newton, at a rate not less than one-and-one-half times their regular rate of pay for work performed in excess of forty (40) hours per workweek.

92. Defendant failed to pay Newton overtime wages for hours worked over forty (40) hours a workweek. As such, Newton is entitled to overtime compensation at one-and-one-half times his regular rate of pay for all work performed in excess of forty (40) hours per workweek.

93. Defendant's unlawful conduct was willful and intentional. Defendant was aware that its practices with regard to Newton's compensation violated the FLSA.

94. Due to Defendant's intentional, willful, and unlawful acts, Newton was deprived of overtime compensation in amounts to be determined at trial, and he is entitled to recovery of these amounts, liquidated damages, and attorney's fees pursuant to the FLSA, each in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the following relief is requested from the Court:

a. A declaratory judgment holding the Restrictive Covenants contained in the Abner Employment Agreement and the Newton Employment Agreement are unlawful, void, and unenforceable pursuant to Florida Statutes § 542.335;

b. Compensatory damages suffered by Newton as a result of Defendant's breach of the Newton Employment Agreement;

c. Compensatory damages suffered by Abner as a result of Defendant's breach of the Abner Employment Agreement;

d. Compensatory damages suffered by Newton as a result of Defendant's violation of the FLSA;

e. Liquidated damages on behalf of Newton as a result of Defendant's violation of the FLSA;

f. Attorneys' fees and costs of these proceedings; and

g. Such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims.

Dated: December 15, 2020

Respectfully submitted,

By: /s/ *Christopher S. Prater*
Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com

Christopher S. Prater
Florida Bar No.: 105488
cprater@pollardllc.com

**Pollard PLLC**
100 SE 3rd Ave., Ste. #601
Fort Lauderdale, FL 33394
Telephone: 954-332-2380
Facsimile: 866-594-5731
*Attorneys for Plaintiffs*